**UNITED STATES of America,
Plaintiff,**

v.

**Henry CLAYTON et al., Defendants.**

**No. 75–CR–94.**

United States District Court,
E. D. Wisconsin.

Feb. 17, 1976.

Thomas P. Doherty, Milwaukee, Wis., for defendant Ransom.

Steven C. Underwood, Milwaukee, Wis., for defendant Clayton.

D. Michael Guerin, Milwaukee, Wis., for defendant Reynolds.

## DECISION AND ORDER

Darryl Ransom, one of the defendants in the above-captioned case, was charged in a one-count indictment with a violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. After trial to a jury, a verdict of guilty was returned January 21, 1976. Judgment on the verdict was entered January 30, 1976, and the defendant Ransom moved for a new trial pursuant to Rule 33, Federal Rules of Criminal Procedure. The issue presented to the Court is whether certain statements of the defendant which were introduced against him at trial should have been suppressed for the reason that in obtaining them, officers violated defendant's rights as defined in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). For the reasons given below, I hold that some of these statements should have been suppressed and, therefore, that defendant's motion for a new trial must be granted.

The essential facts which form the basis for defendant Ransom's motion are not in dispute. After a six-block chase in downtown Milwaukee, the defendant was arrested by a special agent of the Drug Enforcement Agency for violating the Controlled Substances Act, 21 U.S.C. § 801, et seq. At the time of the arrest, the defendant was properly advised of his rights and indicated to Special Agent Ripley, the arresting officer, that he understood them. While the defendant was handcuffed and in the back seat of Agent Ripley's automobile, several questions were asked. The defendant volunteered answers to some of the questions and then indicated that he did not wish to answer any further inquiries.[1] In ac-

William J. Mulligan, U. S. Atty., by Charles N. Clevert, Jr., Asst. U. S. Atty., Milwaukee, Wis., for plaintiff.

1. At the evidentiary hearing held on January 19–20, 1976, pursuant to defendant Ransom's original motion to suppress, Agent Ripley's testimony leaves no doubt that he understood Mr. Ransom to be invoking his Fifth Amendment privilege:

"Q * * * What did he tell you in the car?

cordance with his desires, Agent Ripley ceased his questioning. Drug Enforcement Agency agents then took the defendant to their office.

■ Upon arriving at the Federal Building, the defendant was fingerprinted, photographed, and asked to provide standard personal history information. Afterward, in the Drug Enforcement Agency office, the defendant was given a written statement of rights and waiver form which he signed. Thereupon, Agent Ripley resumed his questioning. At this point, approximately fifty minutes had elapsed since the original interrogation. Answers given by the defendant to some of these questions were introduced by the Government at trial.[2]

"A In the vehicle, after I advised him of his rights and he stated that he understood, I asked him if he had heard Agent Wingert announce himself as a Federal Narcotic Agent at the time the other individuals were arrested near his vehicle and he stated that he had. I asked Mr. Ransom if he had seen the flashing red lights on my vehicle and the vehicle of Agent Scoufis and he stated he had, and I asked him if he heard sirens coming from those vehicles, and he stated he had. And I asked him why he had not stopped, you know, in consideration of those lights and sirens, and he stated that he was afraid that he was being ripped off. And I asked him what he was afraid of being ripped off of, and he declined to make any comment at that point in time.
"Q What do you mean he declined?
"A He didn't answer.
"Q You call that a declination?
"A Right.
    "THE COURT: This is after you gave him the Miranda warnings?
        "THE WITNESS: That's correct.
        "MR. DOHERTY:
"Q Well, when he declined to respond to that, did you interpret that to mean that he no longer wished to discuss that subject with you?
"A That's correct.
"Q And you then continued to talk to Darryl about various other things?
"A No, sir. Then we drive back to the office and said nothing.
"Q Why didn't you pursue it?
"A He indicated to me he didn't want to talk about it any more.
    (Excerpted transcript at pp. 10–11.)

**2.** The evidence gleaned from the second interrogation and presented to the jury through the testimony of Agent Ripley was as follows:

Although these answers contained some exculpatory material, the clear impact of the testimony related was to implicate Ransom in criminal activities. Therefore, if the admission of these statements was error, it cannot be considered harmless error.

In *Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313, 44 U.S.L.W. 4015 (1975), the Supreme Court explored the question of whether and in what circumstances the prosecution is prohibited from using a defendant's in-custody statement obtained after the right to remain silent had been invoked. The Court rejected the conclusion that *Miranda* requires the exclusion of all such statements in every situation. Instead,

"Q How long after Mr. Ransom's arrest did you present him with the form?
"A Approximately fifty minutes.
"Q Did Mr. Ransom sign the form?
"A Yes, sir, he did.
"Q After Mr. Ransom signed the waiver of rights form, did you interview him further?
"A Yes, sir, I did.
"Q Do you recall what he said and what you said?
"A In substance, I do.
"Q Would you please relate that to the jury?
"A I asked Mr. Ransom if he wanted to tell me how he got involved in this deal and he indicated that he had been called at home in Chicago from—by Mr. Clayton who had asked Mr. Ransom to come to Milwaukee. That he had traveled from Chicago to Milwaukee late the prior evening, or prior night, and stayed the remainder of the night at—or with Clayton at an apartment at 27th and Chambers, and that on that particular morning Mr. Clayton had asked Mr. Ransom to drive Clayton to the Emeric Lounge where he had to deliver a package to a guy and get a lot of money.
    I asked Mr. Clayton—I'm sorry. I asked Mr. Ransom if he knew what the package contained, and he stated that he did not know what the package contained.
"Q Did you ask him whether or not he had brought heroin from Chicago to Milwaukee?
"A Yes, sir, I did.
"Q What did he say?
"A I asked him two or three times, and on each occasion he said that he had not brought the heroin from Chicago to Milwaukee."
    (Proceedings held January 19–20, 1976; excerpted transcript at pp. 17–18.)

the Court held that where an accused is administered proper warnings and is asked questions by an officer which he refuses to answer, and then, a significant time later, is administered proper warnings again by a *different* officer and asked about an *unrelated* offense, the answers given during the second questioning are properly admissible at trial. *Michigan v. Mosley,* supra, at 98–109, 96 S.Ct. at 324–329, 46 L.Ed.2d at 319–325, 44 U.S.L.W. at 4017–4019.

■ The Government invokes *Mosley* in support of its position that answers given by the defendant during the second interrogation are admissible. I find this reliance misplaced since the salient facts in *Mosley* are absent in the present case: Ransom was twice questioned within an hour by the *same* officer concerning the *same* crime.

In *Miranda v. Arizona,* supra, the Supreme Court instructed that:

"Once warnings have been given, the subsequent procedure is clear. *If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease.* At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked. * * *" 384 U.S., at 473–474, 86

S.Ct., at 1627–1628. (Emphasis added.)

It has been correctly pointed out that no indication is given in this passage of what circumstances, if any, permit a resumption of questioning. *Michigan v. Mosley,* supra, 423 U.S. at 98, 96 S.Ct. at 324, 46 L.Ed.2d at 319, 44 U.S.L.W. at 4017. However, the logical entailment of the *Miranda* Court's language mandates that "the interrogation must cease" *at least* with respect to the same crime and the same interrogating officer for a substantial period of time. *Id.,* at 103, 96 S.Ct. at 326, 46 L.Ed.2d at 321, 44 U.S.L.W. at 4018. In the present case, after Ransom was understood to have invoked his Fifth Amendment rights, Special Agent Ripley resumed the questioning, as a practical matter, as soon as the defendant was transported to the Drug Enforcement Agency's office, processed, and readvised of his rights. " * * * [T]he admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.' " *Michigan v. Mosley,* supra, at 103, 96 S.Ct. at 326, 46 L.Ed.2d at 321, 44 U.S.L.W. at 4018. Applying these principles to the instant circumstances, I find that the defendant's invocation of his right to remain silent was not accorded the respect it was due by the interrogating officer. Therefore, the statements in question are inadmissible and should have been suppressed.

It is therefore ordered that the verdict and judgment of guilt previously entered against the defendant Darryl Ransom are hereby set aside, and defendant's motion for a new trial is granted.