365 A.2d 366 (1976)
In the Matter of T. T. T., Appellee.
No. 10993.
District of Columbia Court of Appeals.
Argued August 17, 1976.
Decided October 27, 1976.
*367 E. Calvin Golumbic, Asst. Corp. Counsel, Washington, D. C., with whom John R. Risher, Jr., Corp. Counsel, Louis P. Robbins, Principal Asst. Corp. Counsel, and Richard W. Barton, Asst. Corp. Counsel, Washington, D. C., were on the brief, for appellant.
Richard S. Greenlee, Washington, D. C., with whom Mildred M. Matesich, Washington, D. C., was on the brief, for appellee.
Before KERN, NEBEKER and YEAGLEY, Associate Judges.
KERN, Associate Judge:
The government appeals from orders[1] entered by the trial court after hearing testimony on a motion to suppress prior to the fact-finding hearing in a delinquency proceeding in the Family Division. These orders suppress three separate incriminatory statements appellee had given to police on *368 January 24, 1976, during their investigation of a felony murder.
The case commenced in the early morning of December 15, 1975, when the manager of a drug store on North Capitol Street was shot and killed in an unsuccessful robbery attempt. Two days later appellee, apparently believing a reward might be forthcoming, and two others contacted a police officer known to them and volunteered they had information about the shooting. This officer brought them to Detectives Chaney and McCloskey of the Homicide Squad who were in charge of the investigation of the murder. Appellee, having received a Miranda[2] warning given as a matter of course to witnesses in criminal investigations, told them how he had passed the drug store in the morning and seen one Kevin and another being admitted by the decedent through the front door; and, upon walking back past a few minutes later he saw the two running out of the drug store's back door. A written statement of this story was taken routinely from appellee and the detectives thereafter continued their investigation.
By the 24th of January, the investigation of the murder had failed to turn up any leads, including Kevin, and the detectives decided to interview again appellee for further information about Kevin. They drove to appellee's home where they found him outside with his father. They explained their purpose in requesting appellee to come with them to the Homicide Office and advised his father they would return appellee when they were finished. The father neither asked nor was he invited to accompany his son. At the time, although appellee was several weeks shy of his 16th birthday, he had already been arrested on three prior occasions and been advised of and had waived his Miranda rights twice before; he was, according to a forensic psychologist who subsequently tested him, in the "dull, normal" category on the Wexlar Intelligence Scale, which category "includes approximately sixteen percent of the population"; and appellee upon arrival at the Homicide Office about 12:45 p. m. was once more read his Miranda rights and waived them in writing.
All reviewed his December statement whereupon he offered to show the detectives where Kevin's uncle lived. They set forth together for the latter's house which appellee pointed out and then remained by himself in the cruiser while the officers questioned the uncle. They thereby obtained not only Kevin's last name but the news that he was probably in detention on the day that the murder being investigated had occurred. Back they went to Homicide where a check on Kevin's whereabouts in the juvenile system was instituted and a photo array (containing Kevin's photo) was placed before appellee. He picked out Kevin as one of the two he had seen enter and flee from the drug store on the fatal December day.
By 5 p. m. it had been definitely established that Kevin had been in detention on December 15th and appellee was confronted with that fact; he then implicated two other persons but repeated his earlier version of what he had seen. By this time the officers were highly suspicious of appellee but they presented a photo array and he unerringly selected one of the two he had shortly before brought into the story for the first time. During this time appellee appeared calm and unfrightened, had upon request received cigarettes from and been fed sodas by the detectives, and never requested his parents to be called or himself to be taken home.
At 6 p. m. appellee, having once more been warned and having again waived in writing his Miranda rights, commenced a statement in writing recounting how he had been approached about but refused to participate in a plan to rob the drug store. The conscientious trial judge in his findings and conclusions commented that "respondent *369 [appellee] understood his Miranda rights, and at this point could and did make a knowing, voluntary and intelligent waiver of those rights." (Emphasis added.) In about 45 minutes the two detectives interrupted and terminated appellee's statement with the accusation that he was lying and their opinion that he had participated as a lookout. They confronted him with the inconsistencies in his stories and questioned how he could have known certain details of the crime without being present during the occurrence. Appellee, then at about 7 p. m., admitted orally that he had acted as a lookout and the detectives thereupon announced he was under arrest and fastened him into handcuffs attached to the desk at which he was sitting. At 7:13 p. m., and after being advised of and having waived his rights, he gave another statement in writing in which he admitted having been the lookout while one Chapman and one Kingsbury were inside the drug store. However, in the midst of this statement appellee became angry when the detectives questioned whether he himself had not in fact been inside the store and he stopped his statement and refused to say more.
A Youth Service police officer was called and arrived at Homicide; she prepared a so-called Form 379 calling for general information about a juvenile under arrest and also filled out yet another Miranda form containing his answer, among others, that he understood his rights but was not willing to answer questions without an attorney being present; and, she telephoned appellee's stepmother to advise of his arrest and planned detention overnight at the Receiving Home.
Appellee and the two homicide detectives resumed talking and he elaborated on his participation in the murder; they asked him for permission to tape-record what he was saying and he agreed; and, they commenced recording at 9:55 p. m. and concluded at 10:15 p. m. The trial court suppressed not only this tape-recorded statement but also his oral admission at a bit before 7 p. m. that he had acted as lookout for the robbery and his written statement commencing at 7:13 p. m., after his arrest, reiterating his admission of participation in the robbery.
We turn our attention first to the incriminatory admission last given by appellee, viz., the tape recording from 9:45 p. m. to 10:15 p. m. Given the length of time appellee had been with the detectives before making this statement, the fact that he had a few minutes earlier responded in writing on the form given him by the Youth Service officer that he would not answer questions without an attorney, and the further fact that he had expressly asked the Homicide officers (and they had agreed) to terminate the written statement he had commenced at 7:13, we are constrained to agree with the trial court's conclusion that the tape-recorded statement was not voluntary.[3]
We are unable to accept, however, the able trial judge's conclusion that appellee's oral admission just before 7 p. m. and his written statement following 7:13 p. m. "were a product of adolescent fright or despair" in light of the sequence of events and the court's other findings. Examining the totality of circumstances, see In re F. D. P., D.C.App., 352 A.2d 378, 380 (1976), we note the following: appellee himself initiated contact with the police; he was unusually familiar with the criminal justice system in light of his prior juvenile arrests; *370 he was, while with the homicide detectives, out of and away from the Homicide Squad office for various periods of time (attempting to link Kevin to the crime) so that their questioning of him was not in fact sustained and uninterrupted; and, appellee himself was repeatedly given the Miranda warnings and evidenced ability to invoke those Miranda rights whenever he chose to do so by (a) the fact that he later refused to answer more questions from the detectives and (b) he expessly asserted those rights by advising the Youth Service officer he would not speak unless he had an attorney present.
We read the trial court to have concluded on the very factors set forth above that when appellee commenced a statement in writing at 6 p. m. he was at that point in time acting voluntarily; however, the court went on to conclude that as soon thereafter as the detectives stated to him what they had believed for several hours, viz., that he had been a participant in the crime, "the interrogation takes on a new complexion . . . [and] the progression of the interrogation with the confrontation of one inconsistency after another by the two detectives gives rise to an atmosphere of coercion or suggestivity, and tends to render the statements a product of adolescent fright or despair." In short, the only occurrence between the 6 p. m. written statement, which the trial court specifically found voluntary, and the approximately 7 p. m. oral statement, which the court deemed involuntary, was that the detectives revealed to appellee what they had for sometime believed: that he was a suspect because he was lying when he stated others (but not himself) had participated in the crime. The Supreme Court has recently held that the suspicions of investigative officials is not to be deemed such a coercive factor as to necessitate Miranda warnings. See Beckwith v. United States, 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976).[4] Accordingly, we reject the conclusion that announcement by the detectives to appellee that they suspected he had participated in the crime was in and of itself sufficient[5] to transmogrify a voluntary statement into an involuntary one.
But the question then became whether the detectives' arrest of appellee upon his oral admission at a bit before 7 p. m. of complicity in the murder rendered his 7:13 p. m. written admission involuntary. By the time he made this statement, appellee was both in fact and in law "in custody" and the written statement may therefore be fairly characterized as the product of custodial interrogation. However, before he made such written statement, he twice waived his Miranda rights. Given all the circumstances which must be reviewed and evaluated, we deem the court plainly wrong in concluding the 7:13 p. m. written statement was not voluntary. "The record does not disclose any threats, cajolery or prolonged interrogation which would tend to support a claim of involuntariness." United States v. Calhoun, D.C.App., 363 A.2d 277 (1976).
One further point requires comment. Appellee vigorously argues (Br. at 13) that we should not even entertain this appeal in light of "the Corporation Counsel's cavalier disregard of the jurisdictional requirements [of this court's Rules]." He points to the facts that:
On May 13th the trial court filed findings of fact and conclusions of law which contained a conclusory paragraph that "all statements, oral and written, made after the *371 termination of the 6 p. m. statement, must be suppressed";
The government then filed on May 17th a Motion for Clarification of Order in which it urged the court to clarify whether it had intended to suppress appellee's oral admission made before 7 p. m. and his written confession begun at 7:13 p. m. and terminated a few minutes later, since the 7:13 p. m. written statement was allegedly but a continuation of the 6 p. m. written statement (the former even being paginated as part of the latter) and the court's ordering paragraph in its findings of fact and conclusions of law suppressed "all statements. . . made after the termination of the 6:00 p. m. statement" (emphasis added);
The trial court issued on May 20th an order stating that the 7:13 p. m. written statement "was a separate and distinct statement from that begun at 6 p. m., notwithstanding its pagnation" and "accordingly. . . all statements, oral and written, made by respondent [appellee] after the termination . . . of the 6 p. m. written statement . . . hereby are suppressed"; and, the government filed on May 27th a notice of appeal from the "orders . . . entered on May 13, 1976 and May 20, 1976."
Appellee cites District of Columbia v. M. A. C., D.C.App., 328 A.2d 375 (1974), in which we ruled that a government appeal from a pretrial suppression order in a delinquency proceeding is governed by our Rule 4-II(b) which provides for "appeal. . . within ten days after entry of. . . [the] order from which the appeal [was] taken." He contends that since the District's appeal was filed on May 27th and the court's findings and conclusions had been entered on May 13th, the government is four days late and we lack jurisdiction to determine its appeal. We note, however, that the government's appeal was taken within ten days of the trial court's second order of the 20th which itself contained a directive enumerating and then suppressing appellee's various statements. We are persuaded that under these particular circumstances the government has met our Rule and we have jurisdiction to entertain the appeal. We deem the instant case to be quite different from United States v. Fraser, D.C.App., 30 A.2d 761 (1975), where the court orally ordered suppression after a pretrial hearing but delayed entry of its order in order to permit the government time to decide whether or not to appeal that order. Here the government's motion for clarification could not be deemed the equivalent of a request to delay entry of the order in light of the colorable claim of ambiguity the government advances concerning the court's first order.
Appellee asserts that the government was in effect delaying the case since its claim that the order was ambiguous is wholly without merit. Given the unusual circumstances of the 7:13 p. m. written sentence being on its face a continuation of the 6 p. m. written statement and the undoubted need for there to be absolutely no uncertainty as to what statements were excluded from evidence at the fact-finding hearing of this grave offense, we cannot say the government's motion for clarification was spurious.
We reverse the trial court's suppression of (1) the oral admissions made between the 6 p. m. written statement and the 7:13 p. m. written statement and (2) the 7:13 p. m. written statement. We affirm the trial court's suppression of (1) the statement tape-recorded between 9:55 p. m. and 10:15 p. m. and (2) oral admissions by appellee subsequent to the time he terminated his 7:13 p. m. written statement.
So ordered.
NOTES
[1] We discuss the procedural aspects of this appeal from these orders infra at p. 370.
[2] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[3] The government argues that the sequence of events surrounding this confession place it within the practice approved by the Supreme Court in Michigan v. Moseley, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), where the admissibility of a confession concerning a crime unrelated to that about which a defendant had been questioned (and terminated that questioning) was upheld. But there, unlike here, different crimes had been involved and different investigations were being conducted; the relationship in this case between the earlier questioning by Detectives Chaney and McCloskey for this one offense and the later tape-recorded confession is too close and direct to enable us to invoke the Michigan-Moseley rule.
[4] See United States v. Pheaster, 544 F.2d 353 (9th Cir. 1976), where the federal circuit court distinguished between "questioning the suspect and presenting the evidence available against him."
[5] The trial court appears also to have been influenced to reach its conclusion that the 6 p. m. voluntary statement became by 7 p. m. an involuntary one by reason of the absence of appellee's parents, but we have recognized that the fact a juvenile suspect's parents are not present does not per se render his incriminating statement invalid. In re J. F. T., D.C.App., 320 A.2d 322, 324 (1974).