411 A.2d 643 (1980)
In the Matter of C. P., Appellant.
No. 12823.
District of Columbia Court of Appeals.
Argued October 3, 1978.
Decided February 15, 1980.
Rehearing and Rehearing En Banc Denied April 28, 1980.
*644 Roger H. Moore, Washington, D. C., appointed by the court, for appellant.
Dennis McDaniel, Asst. Corp. Counsel, Washington, D. C., with whom Louis P. Robbins, Acting Corp. Counsel, Washington, D. C., when the brief was filed and the case was argued, and Richard W. Barton, Deputy Corp. Counsel, Washington, D. C., were on brief, for appellee.
Before NEBEKER, HARRIS and FERREN, Associate Judges.
HARRIS, Associate Judge:
After a factfinding hearing in the Juvenile Branch of the Family Division of the Superior Court, appellant was found guilty of attempted robbery while armed. D.C. Code 1973, §§ 22-2902, 22-3202. Prior to that hearing, alleging Fifth and Sixth Amendment violations, appellant moved to suppress an inculpatory statement which he had made to his mother in the presence of a police officer at the station house, as well as a statement which he made thereafter to the officer. This appeal challenges the denial of that motion; we affirm.

I
One night at about 10:30 p. m., there was an attempted robbery of a woman who had stopped her car at a traffic light. She hurriedly drove off, frustrating the youthful would-be robbers. Shortly thereafter, appellant (who was 13 years old) and three other juveniles were arrested by Officer Spooner Underwood. They first were taken to a police substation and then to Robbery Squad Headquarters, arriving at the latter location at about midnight. Appellant made no statement at that time. Appellant's mother was called; she arrived at about 1:30 a. m. Officer Underwood told her that charges had been placed against appellant, that she could sit with her son, and that he (Officer Underwood) would talk with them later.
Appellant was given a Metropolitan Police Department rights card, which he read with his mother. While he had never had a comparable experience with law enforcement *645 authorities before (nor had his mother), he signed the card indicating that he understood his rights. He also indicated that he did not wish to answer questions and that he did want an attorney. Appellant's mother testified at the suppression hearing that at about that time (she did not indicate exactly when) another officer remarked to her, as she sat by her son, something to the following effect: "I should get him to tell about what happened because he was in serious trouble." She also testified that soon after appellant filled out the rights card, he repeated that he did not want to say anything.
About 30 minutes after appellant signed the rights card, Officer Underwood went with appellant and his mother into an adjoining room. He sat down with them, and again advised appellant of his rights. The officer then informed the mother that the youths who had been apprehended with her son had confessed and implicated appellant. Thereupon, as Officer Underwood sat silently, appellant's mother called on her son to tell the truth about the incident. At his mother's urging, appellant admitted to having taken part in the attempted robbery, and to having wielded a BB pistol during the episode.
Thereafter, Officer Underwood led appellant and his mother into another room where the other arrested juveniles and their parents were gathered. Each of the youths recounted the part he or she had played in the crime, with appellant apparently then adding to what he had already confessed the fact that he had pointed a pistol at the complainant during the robbery attempt.
At the suppression hearing, appellant alleged that the police officer's "use" of his mother to gain incriminating statements after appellant had indicated his desire to remain silent and to have the assistance of counsel violated both his Fifth and Sixth Amendment rights. The hearing judge, after carefully considering all the evidence and closely questioning both counsel on the nature of the alleged Fifth and Sixth Amendment violations, expressed the following extensive findings and conclusions:
The Court finds on the basis of Defendant's Exhibit No. 1 [the rights card] that this respondent had indicated that he did not wish to make statements without having an attorney present, and indeed he said he did not wish to answer any questions.
He stated, however, that he understood his rights. And he also indicated that his rights had been read to him, and to repeat, that he understood his rights.
The Court finds on the basis of [the rights card] without any evidence to the contrary that this respondent did understand his rights and that indeed he said he did not wish to answer any questions. The Court further finds that this respondent after speaking to his mother while yet in the Robbery Squad's office did state or give an incriminating statement in the presence of the officer and in the presence of the respondent's mother.
The Court finds on the basis of the testimony that that incriminating statement, the substance of which has not been revealed to the Court, was not the result of continued questioning or interrogation by the officers, but was indeed a result of a conversation between the respondent and his mother. The Court does not find that the mother employed any kind of coercion or that this was a ploy established or set up by the police for the purpose of inducing the respondent to waive his rights. Indeed it appears to the Court and the Court finds that this respondent was responding to his mother's urging, albeit, in the presence of the officer when he gave the incriminating statement.
It is a matter of policy that parents ought to be asked to come to the precinct and to the Robbery Squad or any place else where a youngster is being held. And [defense counsel] in his argument candidly points out that the evidence certainly reveals that the officers  and also [the prosecutor] argued to that effect  that the officer did not wait until after this youngster had rendered some statements before calling in the parent. Indeed the parent was called.

*646 And as far as it appears the officer had respected this youngster's indicating that he did not wish to speak, and as I previously stated there was no further questioning by the officers.
The Court is not prepared to hold that a parent may not ask a child to tell the truth or to make a statement concerning the incident. Whatever has been held by Miranda and Gault and other cases and including Brewer v. Williams [430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977)], the latter case of course applies to Gault, there is certainly nothing that the Court can glean from any of them which suggests that a parent or a relative or indeed some other person may not ask a respondent or perhaps an adult to make a statement.
And if the Court need only to confine its findings in this case to a respondent,... on the basis then of all the evidence the Court makes the findings that it has enunciated. On the basis of those findings the Court concludes that this respondent had waived his rights [not] to speak concerning this crime, and that that waiver was not induced by any coercion on the part of the officer, and there certainly was no evidence that it was the result of any coercion on the part of the parent. Accordingly, the Court denies the motion.
Following that determination, appellant was found guilty at a hearing in which his inculpatory statements were admitted into evidence.

II
Our scope of review is limited. See, e. g., D.C.Code 1973, § 17-305(a). As reflected by the above-quoted excerpt from the transcript, the trial court found that appellant understood his Fifth and Sixth Amendment rights, that there was no police questioning after appellant had indicated his desire to remain silent and to have an attorney, and that the inculpatory statement he made in response to his mother's questioning, in the officer's presence, constituted an effective waiver of his rights. The trial court also found that appellant's mother had not been used in a police ploy to induce appellant's waiver, and that his mother did not overbear his will by coercion.[1] In short, the trial court, properly evaluating the totality of the circumstances, determined that the government had satisfied its burden of showing that there had been no infringement of appellant's rights and that his confession was voluntary.[2]
The trial court's ultimate factual finding of voluntariness is not to be overturned unless it is without substantial support in the evidence. See, e. g., Jackson v. United States, D.C.App., 404 A.2d 911, 924 (1979); In re W.B.W., Jr., D.C.App., 397 A.2d 143, 145 (1979); Taylor v. United States, D.C.App., 380 A.2d 989, 992 (1977); United States v. Lyon, D.C.App., 348 A.2d *647 297, 298-99 (1975); In re M.D.J., D.C.App., 346 A.2d 733, 735 (1975); United States v. McNeil, 140 U.S.App.D.C. 3, 433 F.2d 1109 (1969).[3] The record unquestionably supports the trial court's ruling.

III
It is useful to note basically what the Supreme Court resolved in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). In a recent case, the Court reversed a decision of the California Supreme Court and reinstated a trial judge's determination that a juvenile's confession (given during police interrogation, which is not the situation here) had been voluntary. Fare v. Michael C., 442 U.S. 707, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979). In doing so, it succinctly characterized Miranda as follows:
In Miranda v. Arizona, 384 U.S. 436 [, 86 S.Ct. 1602, 16 L.Ed.2d 694] (1966), this Court established certain procedural safeguards designed to protect the rights of an accused, under the Fifth and Fourteenth Amendments, to be free from compelled self-incrimination during custodial interrogation. The Court specified, among other things, that if the accused indicates in any manner that he wishes to remain silent or to consult an attorney, interrogation must cease, and any statement obtained from him during interrogation thereafter may not be admitted against him at his trial.[[4]] Id., at 444-445, 473-474 [, 86 S.Ct. at 1612-1613, 1627-1628.] [99 S.Ct. at 2563.]
Thus, it is clear that custodial interrogation (obviously by governmental authorities) is what was intended to be interdicted, and that the bedrock of Miranda is the Fifth Amendment right "to be free from compelled self-incrimination" or from interrogation in the face of a request for counsel. In this case, it must be borne in mind that there was no custodial interrogation by the police.
We do, of course, continue to operate on the assumption that the principles of Miranda apply in cases in which there has been custodial questioning of a juvenile.[5]See, e. g., In re Creek, D.C.App., 243 A.2d 49 (1968). In addition, we feel obliged to consider juvenile confessions with special caution  particularly those which have been made in the absence of counsel. See In re Gault, 387 U.S. 1, 45 and 55, 87 S.Ct. 1428, 1453 and 1458, 18 L.Ed.2d 527 (1967). We have ruled against the use of a juvenile's confession when police overreaching has been apparent. See, e. g., In re R.A.H., D.C.App., 314 A.2d 133 (1974).
On the other hand, we properly have rejected a per se proscription against the use of confessions by juveniles, holding that despite the special care that must be taken, such confessions may be obtained and used upon a clear showing of both a *648 prior notification of rights and a subsequent knowing and intelligent waiver. See In re W.B.W., Jr., supra, 397 A.2d at 146; In re F.D.P., D.C.App., 352 A.2d 378, 380-81 (1976); In re J.F.T., D.C.App., 320 A.2d 322, 324 (1974).[6]See also North Carolina v. Butler, 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979). Moreover, the Supreme Court has made it clear that the Constitution does not direct a complete ban on police exchange with an accused and the taking of a voluntary statement following a prior assertion of the right to remain silent. Michigan v. Mosley, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). See also Peoples v. United States, D.C.App., 395 A.2d 41 (1978); Taylor v. United States, supra, 380 A.2d at 993; United States v. Rodriguez-Gastelum, 569 F.2d 482, 486-88 (9th Cir. 1978) (en banc). Cf. White v. Finkbeiner, 611 F.2d 186 (7th Cir. 1979); Nash v. Estelle, 597 F.2d 513 (5th Cir. 1979) (en banc) (waiver following assertion of right to counsel).
Applying established law to the facts of this case, we sustain the trial court's finding, which is supported by substantial evidence, that appellant's confession was not the result of police-initiated interrogation, but rather of well-intentioned parental influence. See In re C.P.D., D.C.App., 367 A.2d 133 (1976). In C.P.D., supra, a juvenile arrestee was brought to a station house, was read his rights in the presence of his stepfather, and indicated that he did not want to answer any questions. Then, with a police officer within earshot, the youth, in response to a question from his stepfather, made an inculpatory statement. The officer was allowed to testify as to that statement; we affirmed the finding of guilt. We noted appellant's challenge to the admission of the statement on the ground that its elicitation violated his Miranda rights, and his contention that it was not voluntarily given. After considering the evidence, we concluded:
Since appellant's statement was not given in response to police interrogation, and since there is nothing in the record before us to [indicate] that it was in any way involuntarily obtained as a result of compulsion, we hold that it was correctly admitted into evidence below. [Id., at 135.]
See also Fuller v. United States, 132 U.S. App.D.C. 264, 277-78, 407 F.2d 1199, 1212-14 (1967), cert. denied, 393 U.S. 1120, 89 S.Ct. 999, 22 L.Ed.2d 125 (1969).
There can be no question but that it is a desirable policy for a parent of an accused juvenile to be called to the station house, so as both to be present at the occurrences there and to be able to consult with the youth. Also, appellant properly does not challenge the fact that the officer informed his mother of the nature of the charges, and then advised both mother and son of the other youths' confessions which implicated him. This was information which mother and son were entitled to have, whatever effect it might have on them, and for whatever use they might make of it. See, e. g., United States v. Rodriguez-Gastelum, supra, 569 F.2d at 485 & n. 6; United States v. Pheaster, 544 F.2d 353, 366-68 (9th Cir. 1976), cert. denied sub nom. Inciso v. United States, 429 U.S. 1099, 97 S.Ct. 1118, 51 L.Ed.2d 546 (1977).
Appellant argues that In re C.P.D., supra, is distinguishable from this case because here the police officer did not merely overhear a discussion between parent and child, but rather created the situation which led to the confession made in the officer's presence. However, there was nothing improper in the officer's being present while mother and son were together. See Fuller v. United States, supra. Even assuming that the officer hoped a confession would be forthcoming, that would be insufficient to taint the confession. The officer did not seek to conceal his presence, and he had again advised both appellant and appellant's *649 mother of the youth's Miranda rights immediately before the mother sought to elicit the truth from her son.[7]
As for the comment allegedly made to the mother by another officer at the station house to the effect that she "should get him to tell what happened because he was in serious trouble," such a suggestion  if in fact it was made  perhaps might better have been left unsaid. However, such words, in the overall setting reflected by the record, do not render the subsequent confession involuntary. We note the following statement which was made by the Supreme Court in Fare v. Michael C., supra:
The police did indeed indicate that a co-operative attitude would be to respondent's benefit, but their remarks in this regard were far from threatening or coercive. [99 S.Ct. at 2573.]
Finally, while we are sensitive to the teachings of In re Gault, supra, we do quote with approval the following language of this court which is expressive of the general acceptance of the parens patriae concept which remains inherent in our juvenile justice system:
In delinquency proceedings particularly, it is essential to balance the constitutional rights which relate to possible loss of liberty with the recognized modern approach and policy of care and treatment for the criminally-bent youth. This balancing cannot assume a legal incapacity to waive those rights without sacrificing, in many cases ... the vital interests underlying the policies and goals of the juvenile court system. [In re J.F.T., supra, 320 A.2d at 324.]
Cf. Pee v. United States, 107 U.S.App.D.C. 47, 274 F.2d 556 (1959).
Affirmed.
FERREN, Associate Judge, dissenting:
The majority today holds that when a juvenile in police custody is advised of his Miranda[1] rights and, after consultation with his mother, requests a lawyer and says he "doesn't want to talk," the police constitutionally may ignore his response, urge his mother minutes later to "get him to tell what happened," read the boy his rights once again, listen to him confess the crime as his mother repeatedly implores him "to tell the man the truth"  and then introduce that confession at trial. I dissent because I believe that C.P., under these circumstances, cannot be held to have waived his Fifth Amendment rights to silence and to counsel.[2]

I.
The following sequence of events is undisputed: The police took appellant C.P. *650 (then 13 years old) to Robbery Squad Headquarters at about 12:00 midnight; he expressed a desire to say nothing; his mother arrived at about 1:30 a. m.; the police gave C.P. a Miranda rights card and left him for awhile with his mother, who helped him read it. C.P. then signed the card, indicating that he understood his rights, did not wish to answer questions, and wanted an attorney. After signing the card, he told his mother that he did not want to say anything. At about this time, another police officer told C.P.'s mother that she "should get him to tell what happened because he was in serious trouble." Soon thereafter, one of the police officers who had been present when C.P. asserted his rights took C.P. and his mother aside, advised the youth again of his rights (without giving him a second card to sign), and informed his mother, in C.P.'s presence, that other youths had confessed and implicated C.P. At this point  it was 2:30 a. m., approximately 30 minutes after C.P. originally had invoked his Miranda rights  C.P.'s mother, while the officer sat there silently, urged her son over and over again to tell the truth.[3] Although he expressed great reluctance to talk, see note 3 supra, C.P. eventually confessed his involvement in an attempted robbery while armed.

II.
Miranda and its successors provide two levels of protection. Under the first, a law enforcement officer who proposes to interrogate a suspect in custody must give the necessary warnings and, before questioning begins, obtain a waiver of rights. Whether that waiver is knowing and voluntary is judged by reference to the "particular facts and circumstances." North Carolina v. Butler, 441 U.S. 369, 99 S.Ct. 1755, 1758, 60 L.Ed.2d 286 (1979). The second level of protection is triggered once a suspect asserts, rather than waives, Miranda rights. Thereafter, the officer may not interrogate unless the suspect decides to waive the asserted rights, but there is an additional ingredient: no waiver can be valid unless the suspect's "right to cut off questioning" has been "scrupulously honored" up to the time of the waiver. Michigan v. Mosley, 423 U.S. 96, 104, 96 S.Ct. 321, 326, 46 L.Ed.2d 313 (1975) (quoting Miranda v. Arizona, 384 U.S. 436 at 474, 479, 86 S.Ct. 1602, at 1627, 1630, 16 L.Ed.2d 694 (1966)). Thus, when the second level of protection is at issue, as in this case, the court confronts a two-step inquiry, State v. Nash, 407 A.2d 365, 367-68 (N.H.1979): (1) Have law enforcement officials "scrupulously" refrained from interrogating the suspect once he or she has asserted Miranda rights? (2) If so, has there been a valid waiver, see Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938), based on the "totality of the circumstances" surrounding the interrogation? See Jackson v. United States, D.C.App., 404 A.2d 911, 922 (1979).[4]
*651 Once the court begins a second-level Miranda inquiry, the government inevitably has a heavier burden to show waiver than it does during a first-level inquiry, for it must demonstrate not only that the asserted rights have been "scrupulously honored" but also that the suspect has actually changed his or her mind. See Nash, supra at 368. We have emphasized, moreover, that "when the government attempts to show that a waiver of the right of counsel has been made after such right was once exercised, the government bears a greater burden than when it attempts to show a waiver of the right to remain silent." Jackson, supra at 922 (citing Shreeves v. United States, D.C.App., 395 A.2d 774, 781 (1978), cert. denied, 441 U.S. 943, 99 S.Ct. 2161, 60 L.Ed.2d 1045 (1979)); accord, United States v. Rodriguez-Gastelum, 569 F.2d 482, 485 (9th Cir. 1978) (en banc); Nash, supra at 368.[5] This extra emphasis on protecting an assertion of the right to counsel is premised on the Supreme Court's recognition in Brewer v. Williams, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977), that in contrast with a situation in which "the accused has chosen to make his own decisions," any waiver of the right to counsel, after once asserting it, represents a change in one's view of his or her own competence, which therefore "may properly be viewed with skepticism." Id. at 405 n. 10, 97 S.Ct. at 1243 n. 10 (quoting Mosley, supra, 423 U.S. at 110 n. 2, 96 S.Ct. at 329 n. 2 (White, J. concurring)).
These principles apply to juveniles. Specifically, as to first-level Miranda waivers, this court has stated:
The pertinent factors to consider when determining the validity of waiver of constitutional rights of a juvenile include the individual's age, education and information,... the degree of experience with law enforcement,... the circumstances of the questioning, and delay between arrest and confession, and any allegations of coercion or trickery ... Thus, rather than giving overriding importance to any one factor, the court must consider the totality of circumstances surrounding, the confession. [Matter of D.A.S., D.C.App., 391 A.2d 255, 258 (1978) (citations omitted).]
Accord, Fare v. Michael C., 442 U.S. 707, 99 S.Ct. 2560, 2572, 61 L.Ed.2d 197 (1979); Matter of W.B.W., D.C.App., 397 A.2d 143, 145 (1979).[6]
*652 We also adhere to the adult line of cases when considering second-level Miranda waivers. In Matter of T.T.T., D.C.App., 365 A.2d 366 (1976), we sustained the trial court's suppression of a tape-recorded statement police had obtained from a juvenile sometime between "a few minutes" and two hours after he had "responded in writing on the form given him by the Youth Service officer that he would not answer questions without an attorney," and "had expressly asked" the officers "to terminate the written statement" he had begun earlier. Id. at 369.[7] We did so even though the juvenile, after asking for counsel, had willingly "resumed talking" with two homicide detectives and even "agreed" to tape record the conversation. Id.[8]T.T.T., therefore, makes clear that a second-level waiver cannot be inferred more easily in the case of a juvenile than of an adult. When a child says he or she does want to remain silent and have a lawyer, the government has a substantial burden to show that the child later waived those rights.[9]

III.
Applying the foregoing principles to the undisputed facts of record, I conclude that the trial court committed reversible error in holding that, under the totality of the circumstances, appellant's incriminating statement "was not the result of continued questioning or interrogation by the officers," and that appellant in any event waived his rights to counsel and to silence. These conclusions are "without substantial support in the evidence." Peoples v. United States, D.C.App., 395 A.2d 41, 44 (1978), cert. denied, 442 U.S. 911, 99 S.Ct. 2826, 61 L.Ed.2d 277 (1979); Taylor v. United States, D.C.App., 380 A.2d 989, 992 (1977); United States v. Lyon, D.C.App., 348 A.2d 297, 299 (1975); D.C.Code 1973, § 17-305(a).[10]
*653 A. First, the police did not "scrupulously honor" C.P.'s "right to cut off questioning" once he had asserted his rights to silence and a lawyer.[11] The uncontested facts of record support the conclusion that the police created a mother-son confrontation which led to the confession made in the officer's presence, and even the majority appears willing to assume that "the officer hoped a confession would be forthcoming" in their conversation. Ante at 648. The majority nonetheless accepts the trial court's findings that this was not a "ploy established or set up by the police for the purpose of inducing the respondent to waive his rights," and that C.P.'s incriminating statement was therefore "not the result of continued questioning or interrogation by the officers." I cannot accept those findings. They are unsupportable on this record. The confrontation between mother and son at police headquarters obviously would not have occurred without instigation by the police; C.P.'s mother accordingly became an agent for official interrogation. See, e. g., State v. Kelly, 439 S.W.2d 487 (Mo.1969); Commonwealth v. Mercier, 451 Pa. 211, 302 A.2d 337 (1973); Commonwealth v. Bordner, 432 Pa. 405, 247 A.2d 612 (1968).
More specifically, within 30 minutes after C.P. had asked for a lawyer and said he did not "want to talk," the police urged C.P.'s mother to "get him to tell what happened." See T.T.T., supra at 369 & n. 3; United States v. Clayton, 407 F.Supp. 204, 206 (E.D.Wis.1976). The police then read C.P. his Miranda rights a second time, but altered the procedure used earlier by not giving him a rights card to sign. Compare Mosley, supra, 423 U.S. at 97-98, 96 S.Ct. at 323-324; Peoples, supra at 43. Finally, the police did not give C.P. an opportunity, once again, to consult with his mother privately before she began to urge him "to tell the truth" to Officer Underwood. See note 3 supra. The loss of this opportunity was especially significant in light of new information, supplied by the police, that several youths had just implicated C.P. Under these circumstances, it cannot be said that there was a "momentary cessation," let alone a "significant period of time," Mosley, supra, 423 U.S. at 102, 106, 96 S.Ct. at 326, 327, during which C.P. could reflect before being pressed  over and over again  to tell the police what happened. See note 3 supra. On these facts, the trial court could not have found scrupulous police regard for C.P.'s "right to cut off questioning," as that concept is elaborated in Mosley, supra, and other cases.[12]
*654 B. Even if it could be said, by virtue of the second reading of Miranda rights, that the police had scrupulously honored C.P.'s right to cut off questioning, the record does not support a finding that there was "a knowing, voluntary, and intelligent waiver of a known right." Jackson, supra at 922; see Johnson, supra, 304 U.S. at 464, 58 S.Ct. at 1023; Nash, supra at 368.
In a first-level Miranda inquiry, the Supreme Court recently stated that, absent an express waiver, "[t]he courts must presume that a defendant did not waive his rights; the prosecution's burden is great ..." Butler, supra, 99 S.Ct. at 1757; accord, Tague v. Louisiana, ___ U.S. ___, 100 S.Ct. 652, 62 L.Ed.2d 662 (1980); see Matter of F.D.P., D.C.App., 352 A.2d 378, 380 (1976). The burden is all the greater for a second-level waiver, especially waiver of the right to counsel. Jackson, supra at 922.[13] We consider here an alleged waiver by a 13-year-old boy who had no prior experience with the law enforcement system and required his mother's assistance to read and understand the Miranda warnings in the first place. Then, after consulting with his mother, he asserted the rights to counsel and to silence. When the police read him his rights for a second time only 30 minutes later, and told his mother (in C.P.'s presence) that other youths had implicated her son, C.P. was not given another opportunity to consult privately with his mother. Nor was he even given an opportunity to reflect on the situation before his mother began to press him in front of a police officer to tell what happened  which for awhile C.P. resisted. See note 3 supra. Nor did he expressly waive his rights.
Under these circumstances, I cannot agree that C.P.'s eventual willingness to answer his mother's questions in front of Officer Underwood  without more[14]  was sufficient to support a finding that C.P. made a knowing, voluntary, and intelligent waiver of his previously-asserted right to have a lawyer present before he said anything.[15] The circumstances were simply too coercive, too abrupt, to provide assurance that the government met its heavy burden of proof. Indeed, by virtue of the mother's role here vis-a-vis the police, this case conceptually is the same as if an officer did the questioning  a circumstance which, given C.P.'s stated reluctance to talk, is indistinguishable *655 from one in which the police simply ignored the assertion of rights altogether. See T.T.T., supra; Lyon, supra. Because C.P.'s mother was acting as a police surrogate, not as his confidanteor at least was apparently unable to perceive and take time to explain her dual role to C.P.there is even a strong argument that, under the circumstances, C.P. could not waive his rights without a lawyer's help.[16]

IV.
The Supreme Court, in a case concerning a first-level waiver by a juvenile, recently affirmed the seriousness with which a suspect's request for a lawyer must be taken.
Whether it is a minor or an adult who stands accused, the lawyer is the one person to whom society as a whole looks as the protector of the legal rights of that person in his dealings with the police and the courts. For this reason the Court fashioned in Miranda the rigid rule that an accused's request for an attorney is per se an invocation of his Fifth Amendment rights, requiring that all interrogation cease. [Fare, supra, 99 S.Ct. at 2569.][17]
By sustaining the trial court's ruling, in effect, that C.P.'s right to cut off questioning had been scrupulously honored, and that he waived his rightsincluding the right to a lawyerthis court has completely ignored the government's heavy burden during a second-level Miranda inquiry into waiver of counsel. The court impermissibly cheapens Fifth Amendment rights.
I would reverse and remand to the trial court for an order granting C.P.'s motion to suppress.
NOTES
[1] Such findings, of course, are factual ones to be made by the trial judge, and § 17-305(a) of the Code makes it clear that we are not free to upset them unless they are without supporting evidence. To justify the position taken in his dissenting opinion, our colleague finds it necessary to make his own contrary factual finding that the mother "became an agent [of the police] for official interrogation." [Post, at 653.] We respectfully suggest that the dissent thus reflects a misconception of the proper nature of appellate review. It is not our role to determine how we would have ruled on the motion had we been the trial judge; our sole function is to determine whether the trial court committed reversible error.

Additionally, on several occasions our dissenting colleague characterizes certain testimony upon which he chooses to rely as "undisputed." There is no basis for such an assertion. The trial judge was free to believe or disbelieve any of the testimony. While we have studied the record to determine the existence of supportive evidence, the case must be considered by us in light of the uniquely complete findings which were made by the trial judge, including that "the mother employed [no] kind of coercion."
[2] The Supreme Court recently has noted: "[The] totality of the circumstances approach is adequate to determine whether there has been a waiver even where interrogation of juveniles is involved." Fare v. Michael C., 442 U.S. 707, 725, 99 S.Ct. 2560, 2572, 61 L.Ed.2d 197 (1979). See also Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938).
[3] Some appellate courts apply an "abuse of discretion" standard of review in considering voluntariness questions. See, e. g., State v. Weinacht, 203 Neb. 124, 277 N.W.2d 567, 571 (1979). The proper standard in this jurisdiction was stated succinctly by the circuit court in United States v. McNeil, supra, as follows:

In the case at bar, however, appellant's claim of involuntariness and lack of understanding was squarely presented to the trial judge and was flatly rejected, and only if the judge's decision lacks substantial support in the evidence [are we] disposed to alter it. [140 U.S.App.D.C. at 6, 433 F.2d at 1112.]
[4] After so describing Miranda in Fare v. Michael C., the Supreme Court went on to cite Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), in noting that the proscription of Miranda is applicable "at least during the State's case-in-chief." 99 S.Ct. at 2568.
[5] In the interest of thoroughness, however, we quote the following footnote in the Supreme Court's decision in Fare v. Michael C., supra:

Indeed, this Court has not yet held that Miranda applies with full force to exclude evidence obtained in violation of its prescriptions from consideration in juvenile proceedings, which for certain purposes have been distinguished from formal criminal prosecutions. See McKeiver v. Pennsylvania, 403 U.S. 528, 540-541 [, 91 S.Ct. 1976, 1983-1984, 29 L.Ed.2d 647] (1971) (plurality opinion). We do not decide that issue today. In view of our disposition of this case, we assume without deciding that the Miranda principles were fully applicable to the present proceedings. [99 S.Ct. at 2567 n. 4.]
[6] We are mindful that to be acceptable, such a confession should be "voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair." In re Gault, supra, 387 U.S. at 55, 87 S.Ct. at 1458 (footnote omitted).
[7] Appellant also alleges that his statement which were made during the subsequent roundtable session with the other youths and parents should have been suppressed. However, in view of our conclusion that appellant's inculpatory statement to his mother was not the result of improper police activity, we see no error in the use of the second confession. (The record reflects that nothing critical to his guilt was revealed by appellant at the roundtable session which he had not already revealed in response to his mother's questions.)
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] I do not address the question whether C.P.'s Sixth Amendment right to counsel had attached under the circumstances of this case. See Brewer v. Williams, 430 U.S. 387, 398, 97 S.Ct. 1232, 1239, 51 L.Ed.2d 424 (1977) ("right to counsel granted by the Sixth ... Amendment[] means at least that a person is entitled to the help of a lawyer at or after the time that judicial proceedings have been initiated against him"). The Supreme Court declined an opportunity in Brewer, supra, to resolve questions concerning the interaction between the Fifth Amendment right to have counsel present during interrogation, see Miranda, supra, and the Sixth Amendment right to assistance of counsel. See Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). For helpful discussions of the interrelationship between these Fifth and Sixth Amendment rights, see Grano, Rhode Island v. Innis: A Need to Reconsider the Constitutional Premises Underlying the Law of Confessions, 17 Am.Crim.L.Rev. 1 (1979); Kamisar, Brewer v. Williams, Massiah, and Miranda: What is "Interrogation"? When Does it Matter? 67 Geo. L.J. 1 (1978); White, Rhode Island v. Innis: The Significance of a Suspect's Assertion of His Right to Counsel, 17 Am.Crim.L.Rev. 53 (1979).
[3] C.P.'s mother provided the following undisputed testimony on cross-examination:

A. I was telling him to tell the truth.
Q. And he did he say something then?
A. He didn't want to talk.
Q. Did he tell you that he didn't want to talk?
A. Yes. He was telling the officer that he didn't want to say anything.
Q. Do you remember what he said to the officer?
A. No, not the exact words. He said he didn't want to say anything, he didn't have anything to say.
Q. And then what happened?
A. I told him to tell the truth. I kept telling him to tell the truth, more than once I know.
Q. Well, how many times did you say it?
A. I can't remember. I just kept repeating to him to tell the truth, tell the man the truth, tell what happened.
Q. And what did your son do?
A. He started talking to him.
[4] If the suspect's rights have not been "scrupulously honored," in that the police have provided no demonstrable hiatus between assertion of rights and later questioning, that ends the inquiry. Waiver cannot be found, because there will not have been a period of time during which the suspect could reflect on a possible waiver, unaffected by police overreaching. See Mosley, supra, 423 U.S. at 102, 96 S.Ct. at 325; Peoples v. United States, D.C.App., 395 A.2d 41, 44 (1978), cert. denied 442 U.S. 911, 99 S.Ct. 2826, 61 L.Ed.2d 277 (1979); United States v. Clayton, 407 F.Supp. 204, 207 (E.D. Wis.1976).
[5] Jackson, supra, is a second-level Miranda inquiry, analyzing waiver of the Fifth Amendment right to counsel. In announcing a "greater burden" for waiver of the right to counsel, we relied on our decision in Shreeves, supra, a second-level inquiry into the uncounseled waiver of the Sixth Amendment right to counsel by a suspect who had already retained a lawyer. Thus, for a second-level inquiry, we have perceived no difference between the government's burdens to establish waiver of the Fifth and Sixth Amendment rights to counsel, see Brewer, supra, 430 U.S. at 430 n. 1, 97 S.Ct. at 1256 n. 1 (White, J., dissenting). Moreover in both cases waiver is determined by reference to the "totality of the circumstances."

Nash, supra, makes the distinction between first- and second-level Miranda inquiries but, in contrast with Jackson, supra, the New Hampshire Supreme Court holds under the state constitution that "the right to freedom from self-incrimination include[s] the requirement that a voluntary oral or written express waiver (not induced by further interrogation) be obtained once the right to counsel is asserted." Id. at 368 (emphasis added).
[6] Consistent with this approach, we have "reject[ed] a so-called `per se' rule arbitrarily holding any juvenile's statement involuntary absent the presence of a parent or counsel," In re J.F.T., D.C.App., 320 A.2d 322, 324 (1974); accord, Matter of W.B.W., supra at 146; Matter of T.T.T., D.C.App., 365 A.2d 366, 370 n. 5 (1976). Contra, Lewis v. State, 259 Ind. 431, 435, 288 N.E.2d 138, 142 (1972) (court conditions validity of waiver on child's prior consultation with a parent or other responsible adult); State v. Dino, 359 So.2d 586, 591-92 (La.) cert. denied, 439 U.S. 1047, 99 S.Ct. 722, 58 L.Ed.2d 706 (1978) (same). On the other hand, it is clear that a youth's age, lack of experience and sophistication, and other factors can make parental or other adult participation essential to a valid waiver under certain circumstances. See, e. g., McBride v. Jacobs, 101 U.S.App.D.C. 189, 190, 247 F.2d 595, 596 (1957); State v. Hogan, 297 Minn. 430, 440, 212 N.W.2d 664, 671 (1973); Commonwealth v. Roane, 459 Pa. 389, 391, 329 A.2d 286, 288 (1974).

In all cases, of course, the proper question is whether the child, not the parent, exercised the right to invoke the privilege against self-incrimination. See Matter of S.W.T., 277 N.W.2d 507, 512 (Minn.1979); cf. McBride, supra, 101 U.S.App.D.C. at 190, 247 F.2d at 596 (waiver of the right to counsel is for the juvenile, not the parent, to make unless "the court finds for any reason the minor is not capable of a waiver," in which case "the parent may so waive provided the court also finds there is no conflict of interest between them, and of course the waiver by the parent must be an intelligent, knowing act.").
[7] Compare Taylor v. United States, D.C.App., 380 A.2d 989, 993 (1977) (sustained trial court finding that youth had not asserted the right to counsel).
[8] It is interesting to note, however, that the boy had spoken with the police over a period of several hours before he asserted his rights. We reversed the trial court's suppression of his prior statements, concluding that some occurred before the police had taken him into "custody," while others had been made voluntarily after waivers of Miranda rights. T.T.T., supra at 370.
[9] The present case adds a dimension not yet factored into a Supreme Court decision: a second-level inquiry into the alleged waiver of the Fifth Amendment right to counsel. Fare, supra, and Mosley, supra, were first and second-level Miranda inquiries, respectively, into waiver of the right to remain silent. Butler, supra, was a first-level inquiry into waiver of the Fifth Amendment right to counsel.

On October 30, 1979, however, the Court heard argument in Rhode Island v. Innis, R.I., 391 A.2d 1158 (1978), cert. granted, 440 U.S. 934, 99 S.Ct. 1277, 59, L.Ed.2d 492 (1979), a case in which the suspect was arrested for a shotgun murder, given his Miranda warnings, asserted his right to be represented by counsel, and subsequently incriminated himself in response to a comment by the arresting officer in the suspect's presence to the effect that any child who found the shotgun very likely would get hurt. The Rhode Island Supreme Court concluded that the officer's speech constituted interrogation, even though it was neither directed at defendant nor made with the intention of eliciting incriminating evidence from him. The court also concluded that the suspect neither disavowed his request for an attorney nor otherwise waived his Miranda rights before the officer's remarks were made. The court held, on Fifth Amendment grounds, that the incriminating statements should have been suppressed. On the facts, therefore, Innis presents the Court with the Fifth Amendment analogue of Brewer, supra, a Sixth Amendment case. See note 2 supra.
[10] The majority diminishes our function on review by uncritically accepting the totality of the trial court's findings and conclusions. In assessing the circumstances surrounding the alleged waiver, we must weigh each of the trial court's findings against the evidence of record, for our standard of review is whether the findings have "substantial support in the evidence," Peoples, supra at 44 (emphasis added), not whether they are "without supporting evidence," as stated by the majority. Ante at 646 n. 1. Under the proper standard, we are obliged to scrutinize the findings of the trial court and reverse where a conclusion of law is in apparent conflict with "the sequence of events and the [trial] court's other findings." T.T.T., supra at 369. In fact, in T.T.T., upon examination of the circumstances surrounding the questioning of a juvenile, we accepted the trial court's conclusion that the third statement given by T.T.T. was not voluntary, but reversed the same conclusion with respect to two earlier statements. See note 8 supra.
[11] Compare In re C.P.D., D.C.App., 367 A.2d 133 (1976) (denial of motion to suppress incriminating statement upheld where youth, after asserting the right to silence but not counsel, made an inculpatory statement to his stepfather, overheard by police officer).
[12] In Mosley, supra, the Supreme Court held that admission of an incriminating statement did not violate Miranda principles because the period between assertion of the right to silence and resumption of questioning was two hours; Mosley executed a written waiver after the second set of Miranda warnings; and a different police officer interrogated Mosley the second time at another location about a crime unrelated to the one with which he was first confronted.

In Peoples, supra, we reached the same result where the interval between initial and later questioning was six hours; interrogation resumed at People's request; and a judicial officer gave a second set of Miranda warnings, followed by a written waiver, before questioning took place.
In contrast, in T.T.T., supra, we upheld suppression of a statement which the juvenile "agreed" to make sometime between "a few minutes" and two hours after asserting the right to counsel in writing. Similarly, in Clayton, supra, the court held that the statement should have been suppressed because the interval between the original interrogation (ended by an assertion of Miranda rights) and the resumption of questioning was only 50 minutes, and on both occasions the same officer interrogated the suspect about the same crime  all factors which the court said were forbidden by Mosley, supra.
The circumstances of this case are decidedly closer to T.T.T., supra, and Clayton, supra, than to Mosley, supra or Peoples, supra. In reaching this conclusion I do not suggest that a 30-minute interval between assertion of rights and alleged waiver will never be long enough to assure that the right to cut off questioning has been scrupulously honored. Nor do I suggest that whenever parental consultation with a youth results in a written assertion of rights, the police can never acknowledge a waiver unless it also is in writing, after parental consultation. Nonetheless, whenever there has been a very short period of time since Miranda rights were asserted, and the Miranda procedure itself has been altered, and even private parental consultation has been abandoned between the assertion of rights and the alleged waiver, there must be powerful offsetting evidence before a court can find that the police scrupulously honored the youth's asserted rights to remain silent and to have a lawyer. Such offsetting evidence is simply not present in this case.
[13] To assure that the government's heavy burden has been met, we have said that a second-level waiver of counsel must be documented through "explicit findings of fact" by the trial court. Jackson, supra at 922; See Shreeves, supra at 781. The trial court's findings here do not deal with waiver of counsel; they focus on waiving the right to silence. See ante at 645-646. In any event, as already indicted, I do not find record support for a waiver of the right to counsel.
[14] According to the Supreme Court in Miranda, supra, 384 U.S. at 475, 86 S.Ct. at 1628:

An express statement that the individual is willing to make a statement and does not want an attorney followed closely by a statement could constitute a waiver. But a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained.
[15] Compare T.T.T., supra at 369-70 (second-level statement suppressed where juvenile, after asserting the right to counsel, "resumed talking" with police and "agreed" to tape-record conversation) with Fare, supra, 99 S.Ct. at 2572 (first-level statement admitted where, "after the police officer once more had explained his rights to him, respondent clearly expressed his willingness to waive his rights and continue the interrogation").
[16] I agree with the trial court that "parents ought to be asked to come to the precinct and to the Robbery Squad or any place else where a youngster is being held," and that nothing should preclude a parent's asking "a child to tell the truth or to make a statement concerning the incident." Ante at 645-646. The point here, though, is that the mother, after acting as C.P.'s confidante at the time he asserted his rights, either changed her mind or persisted in advice which C.P. had rejected in asserting his rights. Either way, a child who had been dependent on his mother for reading the rights card in the first place cannot be said to have waived his rights without, at the very least, a confidential discussion with his mother. Whether such a hiatus in the sequence of events would have been enough to remove the mother from the role of police surrogate (even though questioning took place while C.P. was in custody, with Officer Underwood present), and, in any event, whether C.P., given such additional time to reflect, could be found to have knowingly and voluntarily waived his rights, having asked for a lawyer "a few minutes earlier," T.T.T., supra at 369, is problematic. The trial court must be sure that the waiver is the child's not the parent's. See McBride, supra, 101 U.S.App.D.C. at 190, 247 F.2d at 596; S.W.T., supra; note 6 supra. For all the encouragement the court should give to parentchild consultation, the court, above all, must be sure that the child's own decision as to assertion of rights or waiver is honored.
[17] As indicated earlier, we have said that a suspect can make a second-level waiver of the Fifth Amendment right to counsel (commonly without consulting an attorney) based on the totality of the circumstances. See Jackson, supra. That question is now before the Supreme Court in Innis, supra. See note 9 supra.