Curtis L. PEOPLES, Appellant,

v.

UNITED STATES, Appellee.

No. 11915.

District of Columbia Court of Appeals.

Argued June 28, 1978.

Decided Nov. 13, 1978.

Charles W. Halleck, Washington, D. C., for appellant.

William J. Hardy, Jr., Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., John A. Terry, Michael W. Farrell and Jason D. Kogan, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee.

Before KELLY, NEBEKER and HARRIS, Associate Judges.

KELLY, Associate Judge:

In an eight-count indictment filed on October 20, 1976, appellant was charged and later convicted of felony murder (D.C.Code 1973, § 22-2401), second-degree murder while armed (D.C.Code 1973), §§ 22-2403, -3202), attempted robbery while armed (D.C.Code 1973, §§ 22-2902, -3202), and assault with intent to rob (D.C.Code 1973, § 22-501) of Thomas L. Daly; armed robbery (D.C.Code 1973, §§ 22-2901, -3202), robbery (D.C.Code 1973, § 22-2901), and assault with a deadly weapon (D.C.Code 1973, § 22-502) of John C. Webb; and, unauthorized use of a motor vehicle (D.C. Code 1973, § 22-2204).[1] He claims on appeal that the trial court erred (1) in denying his pretrial motion to suppress certain statements made to police; (2) in allowing the government to introduce at trial certain rebuttal evidence; and (3) in quashing his subpoenas duces tecum.[2] Finding no error, we affirm.

According to the evidence presented by the government at the motions hearing, at 8:50 a. m. on October 2, 1976, Officer William L. Lowry of the Prince George's County Police Department, stopped appellant in Maryland for driving a stolen car. Appellant shot at Officer Lowry and fled into an adjacent dwelling. Trained police dogs were sent into the building and subdued appellant. Before taking appellant to the hospital so that his dog bites could be treated, Private Darnell M. Kingman arrested appellant and read him his *Miranda* rights.[3] Appellant said that he understood these rights and that his name was "James Anthony Harris"; he also gave two different birthdates. At the hospital, Kingman told appellant that (1) he knew his true identity, and (2) District of Columbia police authorities had issued a warrant for him for murder. Appellant's initial response was, "I guess you've got me now", followed by a statement that he did not want to say anything further unless his lawyer was present. Immediately thereafter, Kingman called the Maryland stationhouse to make some inquiries about setting up a session with appellant's lawyer. During the telephone conversation, Kingman was informed that the police had found the gun used by appellant to shoot at Officer Lowry. After Kingman told appellant of this fact and asked again about the District of Columbia homicide, appellant related some details of the Daly murder, stating that Ricardo Hunter, his partner, had murdered Daly.[4] Kingman transported appellant from the hospital to the Detective Bureau at Seat Pleasant, Maryland, and turned him over to Detective Edge of the Prince George's County Police Department.

At 12:11 p. m., Detective Edge advised appellant of his *Miranda* rights and appellant signed the appropriate police card. Edge questioned appellant about the Maryland case but appellant, after first agreeing to talk, changed his mind and told Edge

---

1. On February 7, 1977, appellant was sentenced to twenty years to life on the felony murder of Daly count, ten to thirty years on the armed robbery of Webb count, and one year on the unauthorized use of a motor vehicle count, all terms to run consecutively. The trial judge dismissed the second-degree murder count and suspended imposition of sentence on all remaining charges.

2. We have examined the record and find this claim of error without merit.

3. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

4. Hunter pled guilty to the second-degree murder and armed robbery of Daly. On February 11, 1977, the trial judge sentenced Hunter to twelve to thirty years on the murder count and eight to twenty-four years on the armed robbery count, both sentences to run consecutively.

that he did not want to give a statement. Edge sensed that appellant was personally hostile to him and asked another detective, Monzel L. Suder, to speak to appellant. Suder also read appellant his *Miranda* rights. Appellant then gave Suder a handwritten statement on the Maryland crimes and also told Suder that Hunter killed Daly. Appellant later related this same information to Detective Edge.

At 5:45 p. m., appellant was brought before the Commissioner of the District Court of Maryland, and informed of his *Miranda* rights. Appellant stated he understood his rights and signed a document to that effect. At 6:30 p. m., he was brought back to the Prince George's County Police Department where he was met by Detective Larry D. Williams of the District of Columbia Metropolitan Police Homicide Bureau. Detective Williams had been summoned by the Prince George's police after appellant said that he wanted to speak to a member of the Metropolitan Police Department in regard to the circumstances underlying the District of Columbia warrant. Williams read appellant his rights, and appellant said that he understood and waived each right. At 7:00 p. m., appellant gave Detective Williams a four-page statement on the District of Columbia crimes, signing each page and initialing a further waiver of his *Miranda* rights.

Appellant's first contention is that the trial court erred in denying his motion to suppress the statements he made to the Maryland and District of Columbia police. He claims that these statements, in which he admitted his participation in Daly's murder and Webb's robbery, were obtained in violation of his rights under *Miranda*, and, therefore, should have been suppressed.

The government concedes in its appellate brief that the twice-resumed questioning of appellant (by Kingman and Suder)

> . . . of however brief duration and whatever slight intensity, following indications that he wished to remain silent, does not comport with the requirement of *Miranda* that an arrestee's assertion of his 'right to cut off questioning' be 'scrupulously honored'. *Michigan v. Mosley,* 423 U.S. 96, 104 [96 S.Ct. 321, 46 L.Ed.2d 313] (1975), quoting from *Miranda v. Arizona, supra* [384 U.S.] at 474, 479 [86 S.Ct. 1602].

The government maintains, however, that this court must separate these two instances of questioning by the Maryland police from the ultimate four-page statement given to Detective Williams.[5] It asserts that the subsequent confession to Williams was not tainted by any impropriety which infected appellant's earlier statements. We agree with the government's approach conceptually, for at issue is the voluntariness of appellant's statement on the District of Columbia crimes given to Detective Williams. We add, however, that the voluntariness of that ultimate statement, the crux of the government's case and the only statement introduced in its case-in-chief, must necessarily rest on a review of the circumstances leading to and contemporaneous with that statement.

█ Voluntariness of a *Miranda* waiver is to be determined by the trial court in light of the totality of the circumstances of each case, *United States v. Lyon,* D.C.App., 348 A.2d 297, 298–99 (1975). Our scope of review is limited. The trial court's conclusion that appellant's statement was voluntarily made will not be overturned unless it

---

5. Although the government concedes that the twice-resumed questioning violated *Michigan v. Mosley, supra,* we suggest that a factual distinction, at least as to one of appellant's interrogation periods, exists. *Mosley* dealt only with a request to remain silent; at issue herein is also a request for an attorney, followed by resumed questioning. This court has held that the *Miranda* standard is violated where questioning continues despite police awareness that an accused desires the presence of an attorney. *United States v. Lyon,* D.C.App., 348 A.2d 297,

299 (1975); *In re R. A. H.,* D.C.App., 314 A.2d 133, 134 (1974). We note, however, that Detective Kingman resumed questioning only after he had informed appellant of the evidence against him. *See United States v. Pheaster,* 544 F.2d 353, 366–68 (9th Cir. 1976), *cert. denied sub nom. Inciso v. United States,* 429 U.S. 1099, 97 S.Ct. 1118, 51 L.Ed.2d 546 (1977); *Lindsay v. United States,* 542 F.2d 755, 757 (8th Cir. 1976). Only the statement to Williams was used by the government in its case at trial.

was without substantial support in the evidence. *See United States v. Lyon, supra* at 299; *United States v. McNeil,* 140 U.S.App. D.C. 3, 6, 433 F.2d 1109, 1112 (1969). The record in this case supports the trial court's finding of voluntariness and waiver, and therefore, the validity of the denial of appellant's suppression motion.

In *Miranda v. Arizona, supra,* 384 U.S. at 473, 86 S.Ct. 1602, the Supreme Court admonished that interrogation must cease when the person in custody indicates that he/she wishes to remain silent. The Court did not, however, state under what circumstances, if any, a resumption of questioning is permissible. In the later case of *Michigan v. Mosley, supra,* the Court rejected the notion that *Miranda* had "create[d] a per se proscription of any further interrogation once the person being questioned has indicated a desire to remain silent." *Michigan v. Mosley, supra,* 423 U.S. at 103 n.9, 96 S.Ct. at 326. The Court concluded that the admissibility of statements obtained after a person in custody has decided to remain silent depends under *Miranda* on whether his right to cut off questioning was "scrupulously honored." *Id.* at 104, 96 S.Ct. 321. Since the "scrupulously honored" standard relies on the particular facts and circumstances of the police interrogation, we look to the circumstances summarized by the Supreme Court in *Mosley* in support of its finding of no *Miranda* violation:

> [T]he police here immediately ceased the interrogation, resumed questioning only after the passage of a significant period of time and the provision of a fresh set of warnings, and restricted the second interrogation to a crime that had not been a subject of the earlier interrogation. [*Id.* at 106, 96 S.Ct. at 327.] [6]

■ Turning to the instant case, we conclude that the trial court did not err in finding appellant's confession voluntary. Our conclusion is supported by record evidence that appellant was interviewed by Detective Williams (1) only after he had been taken before a judicial officer and given a fresh set of *Miranda* warnings; (2) at his own request; (3) six hours after his previous interrogation session; and (4) after Williams had reread him his *Miranda* rights. Although unlike the *Mosley* fact pattern, the Williams' interrogation focused on the subject matter of a previous interrogation, given the time that had lapsed between sessions (from 12:30 p. m. until 6:30 p. m.) and the fresh set of full and complete *Miranda* warnings (by both the Maryland Commissioner and Detective Williams), two linchpins of the *Mosley* decision are easily satisfied. More importantly, review of the circumstances leading to appellant's confession reveals quite clearly that the critical safeguard identified in *Miranda*—the right of an accused to cut off questioning—was respected. Clearly, any literal interpretation of this *Miranda* requirement would lead to absurd and unintended results.[7] Thus, we conclude that as there is substantial record support for the trial court's finding of voluntariness, the denial of appellant's suppression motion was not error.

The second contention is that the trial judge abused his discretion in allowing the government to introduce appellant's written confession given to Detective Suder

---

**6.** The particular facts in *Mosley* were as follows. When Mosley stated that he did not want to talk, the initial interrogation was terminated. Two hours later, after giving a new set of *Miranda* warnings, another officer questioned Mosley about a different crime. After being informed of evidence implicating him in the second crime, Mosley made an incriminating statement which was subsequently introduced at his trial.

**7.** As the court stated:

> To permit the continuation of custodial interrogation after a momentary cessation would clearly frustrate the purposes of *Miranda* by allowing repeated rounds of questioning to undermine the will of the person being questioned. At the other extreme, a blanket prohibition against the taking of voluntary statements or a permanent immunity from further interrogation, regardless of the circumstances, would transform the *Miranda* safeguards into wholly irrational obstacles to legitimate police investigative activity, and deprive suspects of an opportunity to make informed and intelligent assessments of their interests. [*Michigan v. Mosley, supra* at 102, 96 S.Ct. at 326.]

concerning the Maryland crimes.[8] This statement was introduced at trial in rebuttal for the impeachment purposes.[9]

 In admitting into evidence appellant's statement to Detective Suder, the trial judge noted that it was appellant who raised the issue of his arrest and statements to the Maryland police.[10] On direct examination, appellant characterized his October 2 encounter with the Maryland police as a groundless arrest followed by threats, mistreatment, coercion, maiming, and police fabrication, all culminating in his being forced to sign blank pieces of paper. As this court iterated in *Adams v. United States*, D.C.App., 379 A.2d 961, 965 (1977), appellant cannot complain on appeal that he was prejudiced by evidence relating to a subject that he himself opened up. *Accord, Walder v. United States*, 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954). *See also United States v. Kubitsky*, 469 F.2d 1253, 1254–55 (1st Cir. 1972), *cert. denied*, 411 U.S. 908, 93 S.Ct. 1536, 36 L.Ed.2d 198 (1973); *Dorsey v. United States*, 125 U.S. App.D.C. 355, 372 F.2d 928 (1967). Clearly, when appellant sought to show through his own testimony that his statement to Williams was the result of police brutality and, therefore, not voluntary, it was well within the trial court's discretion to allow impeachment by the government through the testimony of Detective Suder. It was, after all, critical to the government's case to rebut and impeach any testimony that indicated circumstances of coercion underlying appellant's subsequent statement to Detective Williams. While there is no doubt that the introduction of appellant's statement was prejudicial, the government had a right to elicit explanatory testimony from Detective

Suder, *see Johnson v. United States*, D.C. App., 298 A.2d 516, 518 (1972), so as to demonstrate the circumstances of appellant's arrest and the context in which the statements were given.

*Affirmed.*

---

**8.** The statement described appellant's Maryland activities—stealing a car, carrying a loaded .38 caliber pistol, robbing a man at gunpoint of $88 and housebreaking.

**9.** The trial court gave a limiting instruction on the confession.

**10.** A brief mention of appellant's Maryland activities first came during testimony in the government's case-in-chief. Detective Williams testified that his sergeant had telephoned him at home to advise him that he had received a phone call from Sgt. Horsecamp (phonetic),

who was assigned to the Homicide Branch of the Metropolitan Police Department, and he told me that he had received a phone call from the Prince George's County Homicide Branch informing him that Mr. Curtis Peoples had been arrested by that police department and at that time they knew I had an outstanding felony murder warrant for Mr. Peoples, and they informed Sgt. Horsecamp that Mr. Peoples at that time wanted to speak to a member of the Metropolitan Police Department in regard to that crime that I had a warrant for.