**Ezzard C. LAWRENCE, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 87–313.

District of Columbia Court of Appeals.

Argued June 14, 1989.
Decided Nov. 15, 1989.

Borge Varmer, for appellant.

Su Zann Lamb, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., Michael W. Farrell, Asst. U.S. Atty. at the time the brief was filed, and Helen M. Bollwerk, Asst. U.S. Atty., Washington, D.C., were on the brief, for appellee.

Before NEWMAN and SCHWELB, Associate Judges, and REILLY, Senior Judge.

SCHWELB, Associate Judge:

Ezzard Charles Lawrence appeals from his conviction of possession of heroin, in violation of D.C.Code § 33–541(a) (1981 & 1989 Supp.). His sole contention is that the trial judge committed reversible error in denying his pretrial motion to suppress the heroin. Concluding that the judge correctly held that the contraband was recovered as a result of a contact between Lawrence and a police officer which did not constitute a seizure within the meaning of the Fourth Amendment, we affirm Lawrence's conviction.

## I THE EVIDENCE

The only witnesses at the suppression hearing were Officer Ronald H. Ward of the Metropolitan Police Department and Appellant Lawrence. Officer Ward, a thirteen year police veteran, testified that on August 22, 1986, he was participating in a police operation designed to apprehend violators of the drug laws in the 1500 block of Alabama Avenue, S.E., an area known for narcotics activity. Ward and his partner drove their car off 15th Place, S.E., into an alley that parallels Alabama Avenue. The vehicle stopped in front of a paved passageway between the buildings facing Alabama Avenue, S.E. Ward observed a group of five to seven people on the sidewalk by the fence on Alabama Avenue. Lawrence was one of these individuals.

Officer Ward testified that, at approximately the same time, a police vice cruiser turned off Stanton Road, S.E. into the 1500 block of Alabama Avenue, S.E., and stopped near the individuals who had gathered on the sidewalk. The members of that group rapidly dispersed in different directions. Lawrence walked up the passageway directly towards Ward, who had begun to walk down the same passageway in the direction of Alabama Avenue. Noticing that Lawrence's left hand was clenched, Officer Ward thought that he might be concealing drugs. Ward testified that he stopped directly in front of Lawrence and identified himself as a police officer. Using what he described as a conversational tone, Ward asked Lawrence what he had in his hand.

Officer Ward stated that although the passageway was narrow, Lawrence could have walked around him on the sidewalk, which was approximately three feet wide. According to Ward, however, Lawrence chose not to do so. Rather, he stopped and opened his hand, which contained one clear plastic packet of white powder. Officer Ward recognized, on the basis of the packaging, that the powder was probably heroin. He seized the packet and, after a field test of the contraband on the scene produced a positive reaction for opiates, he arrested Lawrence.[1]

Lawrence testified that he had come to the area from his home in Alexandria, Virginia in order to retrieve a tool set which he had lent to someone whom he knew from a drug treatment clinic. He explained that he had asked some people

---

1. Officer Ward's testimony was not a model of consistency. He initially testified that he "stopped" Lawrence before asking him what he had in his hand, and that Lawrence "stopped right in front of me because he couldn't go around because of other people." Later in his testimony, however, Ward stated that he never told Lawrence to halt, and that "I didn't make any effort to, you know, forcibly stop him or made him do what he did." In response to a question from the judge, Officer Ward stated that Lawrence could have walked around him. He later elaborated that "he had enough room to walk around me instead of squeezing by."

where he could find his friend, but he was unable to locate the man. He then walked across the street, passing through a group of people on the sidewalk, and continued down the passageway. Seeing some money on the ground, he picked it up. At this point, he noticed Officer Ward and another man "shaking down" a third man against a fence in the walkway. Lawrence did not know who Ward was, but heard him say that he had seen the third man drop something on the ground.

According to Lawrence, Officer Ward then hollered, "Hey, big boy, come here." After Lawrence turned to see who was calling, Ward approached him, inquired what he had in his hand, and "asked" him to open it. Believing that his hand contained nothing more than two tightly rolled bills, Lawrence opened it. Unfortunately for Lawrence, however, Officer Ward took the money from him, and the package of white powder fell out. Ward then returned the money to Lawrence and another officer apparently field-tested the substance. The officers discovered that he had failed to pay a fine for a traffic violation and placed him under arrest. They also told him that the powder had tested positive for heroin.

Lawrence did not claim that Officer Ward compelled him to open his hand. Indeed, he asserted that he had done so because he felt that he had done nothing wrong. He testified that he did not know that there were illegal drugs with the dollar bills which he had found. There was some confusion in his testimony as to whether he even knew, at the time that he

was asked to open his hand, that Ward was a police officer. In response to the prosecutor's inquiry whether the officer had physically restrained him in any way or had forced him to open his hand, Lawrence stated simply: "No, he didn't."

## II THE TRIAL JUDGE'S RULING

The trial judge, Honorable Luke C. Moore, denied the motion to suppress. He found that the defendant was unsure that Ward was a police officer, and that he had "practically admitted or conceded that he was not restrained." The judge stated that "it was the defendant's belief that he had done nothing [wrong] and he had no reason not to open his hand." He found that Lawrence could have remained "mum" and kept walking, but instead "elected" to open his hand. He concluded that, under the circumstances, a reasonable person would not have believed that he was required to respond to the officer's request.

 Noting that there was some divergence in the accounts of the two witnesses, and explicitly crediting the testimony of the officer,[2] Judge Moore found that "this was a police-citizen encounter no more intrusive than what was done in *Gomez v. Turner,*[3] and *United States v. Barnes.*"[4] The judge concluded that since the officer had determined that Lawrence was in possession of what appeared to be heroin, there was probable cause for the arrest. Accordingly, the judge denied the motion to suppress.[5] Lawrence was subsequently con-

---

**2.** Our dissenting colleague treats Lawrence's testimony as to certain events—*e.g.,* that Officer Ward said "Hey, big boy, come here" to Lawrence, and that Lawrence had seen Officer Ward and another officer shaking down a man against a wall—as though the judge had found that these events had taken place. The judge did not so find. On the contrary, he explicitly stated that he credited the officer's testimony over Lawrence's as to disputed matters, and he obviously disbelieved some of Lawrence's testimony even where it was not specifically contradicted.

According to the dissent, Officer Ward used "a tone indicating that he was ordering Lawrence to stop." The officer testified, however, that he used a conversational tone, and Judge Moore explicitly found that the officer's comment to

Lawrence was a "request, not [a] command." Although some might suspect that this is not the way it happens on the street, any such suspicions would not provide a basis for overturning an explicit finding by the judge who heard the testimony.

Finally, even if one could rely on Lawrence's testimony as to what occurred as equivalent to a finding by the trial judge, the fact is that Lawrence himself testified that he was not restrained in any way and acted voluntarily.

**3.** 217 U.S.App.D.C. 281, 672 F.2d 134 (1982).

**4.** 496 A.2d 1040 (D.C.1985).

**5.** The judge rejected the government's alternative argument that, even if the officer's request

victed by a jury of unlawful possession of heroin, and this appeal followed.

## III LEGAL DISCUSSION

### A. *The authorities*

Lawrence claims that the trial judge erred in ruling that his encounter with Officer Ward did not amount to a Fourth Amendment seizure. In particular, he argues that it constituted an unlawful detention because, under all of the circumstances, a reasonable person would have concluded that he was not free to leave the scene or to refuse the officer's request. Measuring Lawrence's contentions against the record developed at the motions hearing and Judge Moore's factual findings, however, we are constrained to disagree and affirm.

 On appeal from the denial of a motion to suppress evidence, this court's scope of review is limited. *Peoples v. United States,* 395 A.2d 41, 43 (D.C.1978), *cert. denied,* 442 U.S. 911, 99 S.Ct. 2826, 61 L.Ed.2d 277 (1979). We give deference to the trial judge's findings of fact, *Giles v. United States,* 400 A.2d 1051, 1054 (D.C. 1979), and must accept his resolution of conflicting testimony. *United States v. Alexander,* 428 A.2d 42, 49–50 (D.C.1981). Moreover, the judge's factual findings will not be disturbed unless they are clearly erroneous, *i.e.,* without substantial support in the record. *Id.* Nevertheless, the ultimate determination as to whether a seizure occurred remains a question of law. *Richardson v. United States,* 520 A.2d 692, 696 (D.C.), *cert. denied,* 484 U.S. 917, 108 S.Ct. 267, 98 L.Ed.2d 224 (1987). As a result, "we must review independently the trial court's conclusion, giving due deference to the trial court's findings of fact concerning appellant's encounter with the police." *Id.*

 In reviewing this ultimate question of law, we have recognized that "[t]he touchstone regarding whether a person has been 'seized' within the meaning of the Fourth Amendment is whether a reasonable person would have felt free to leave." *Id.; Barnes, supra,* 496 A.2d at 1044. *See also Michigan v. Chesternut,* 486 U.S. 567, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988); *Florida v. Royer,* 460 U.S. 491, 497, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983) (White, J., plurality opinion); *United States v. Mendenhall,* 446 U.S. 544, 554– 55, 100 S.Ct. 1870, 1877–78, 64 L.Ed.2d 497 (1980) (Stewart, J., plurality opinion); *Turner, supra,* 217 U.S.App.D.C. at 288, 672 F.2d at 141. The test is an objective one, focusing on a reasonable person's interpretation of the conduct in question, and thus allowing the police to determine in advance whether the conduct contemplated will implicate the Fourth Amendment. *Chesternut, supra,* 108 S.Ct. at 1980.

Under the applicable case law, however, the inquiry whether a reasonable person would feel free to leave when approached by a police officer under a variety of circumstances has become an increasingly sophisticated one. In *Barnes, supra,* 496 A.2d at 1044, this court noted that the Supreme Court, opting in favor of public safety in relation to such encounters between citizens and police officers, has raised the threshold of what constitutes a seizure. Indeed, the Court has concluded that reasonable persons would feel free to leave under circumstances in which many of us would discern the existence of considerable pressure not to do so. *See, e.g., Mendenhall, supra.*

In other areas of the law, the concept of freedom of choice is an expansive one. In racial discrimination cases, for example, courts have long held that freedom of choice can exist only if the choice is free in the practical context of its exercise. *Coppedge v. Franklin County Bd. of Educ.,* 273 F.Supp. 289, 299 (E.D.N.C.1967), *aff'd,* 394 F.2d 410 (4th Cir.1968). "If choice influencing factors are not eliminated, freedom of choice is a fantasy." *Lee v. Macon*

---

that Lawrence open his hand constituted a seizure, it was supported by the requisite articulable suspicion of criminal activity. He stated, and we agree, that "just having a group of persons standing together even in a high-drug area,

while they may be discussing the drugs or the like, it does not appear to the court that that rises to the standard that's required in [*Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) ]."

*County Bd. of Educ.,* 267 F.Supp. 458, 479 (M.D.Ala.1967) (three judge court), *aff'd sub nom. Wallance v. United States,* 389 U.S. 215, 88 S.Ct. 415, 19 L.Ed.2d 422 (1967). If these principles were transposed to Fourth Amendment jurisprudence, suppression would surely be called for in a host of cases, including the present one. An officer's request to Lawrence to stop and open his hand, under the circumstances of this case, must reasonably be deemed, at least, a significant "choice influencing factor." As one empirical study has concluded,

> In high-crime areas, particularly, persons who stop and answer police questions do so for a variety of reasons, including a willingness to cooperate with police, a fear of police, a belief that a refusal to cooperate will result in arrest, or a combination of all three.

L. TIFFANY, D. MCINTYRE & D. TOTENBERG, DETECTION OF CRIME 17 (1967), *quoted in* 3 W. LAFAVE, SEARCH AND SEIZURE § 9.2(h) at 408 (1987 and Supp.1989) (hereinafter LA-FAVE).

Although the "broad" view of freedom of choice might theoretically have been applied to street encounters between police officers and citizens, *see Schneckloth v. Bustamonte,* 412 U.S. 218, 276–77, 93 S.Ct. 2041, 2072–73, 36 L.Ed.2d 854 (1973) (separate dissenting opinions of Justices Brennan and Marshall), we can now say with some assurance that this has not occurred, and that no such development is around the corner. As Professor LaFave has explained, if the concept of "freedom to walk away"

> is taken to mean that a pedestrian whose movements have been interrupted and who is questioned is likely to feel free to depart without responding, it is a highly questionable conclusion. As noted *Illinois Migrant Council v. Pilliod:* [6] "Implicit in the introduction of the [officer] and the initial questioning is a show of authority to which the average person encountered will feel obliged to stop and

respond. Few will feel that they can walk away or refuse to answer." [7] This, it is submitted, is an accurate characterization of the great majority of situations in which an officer approaches a pedestrian and seeks an explanation for his activities or even identification. Thus, if the ultimate issue is perceived as being whether the suspect "would feel free to walk away," then virtually all police-citizen encounters must in fact be deemed to involve a Fourth Amendment seizure. The *Mendenhall–Royer* standard should not be given such a literal reading as to produce such a result.

LAFAVE, *supra,* at 410–11.

Professor LaFave suggests an approach which would permit police officers

> to seek cooperation, even where this may involve inconvenience or embarrassment for the citizen, and even though many citizens will defer to this authority of the police because they believe—in some vague way—that they should.

*Id.* at 411, *quoting* MODEL CODE OF PRE-ARRAIGNMENT PROCEDURE 258 (1975). In his view, the "moral and instinctive pressures to cooperate" are generally sound, and the police may quite properly rely on them. Accordingly,

> a street encounter does not amount to a fourth amendment seizure merely because of those pressures—that is, merely because the other party to the encounter is known to be a policeman. Rather, the confrontation is a seizure only if the officer adds to those inherent pressures by engaging in conduct significantly beyond that accepted in social intercourse. The critical factor is whether the policeman, even if making inquiries a private citizen would not, has otherwise conducted himself in a manner which would be perceived as a nonoffensive contact if it occurred between two ordinary citizens.

*Id.* at 412.

Professor LaFave's approach is consistent with the applicable case law. In *Chest-*

---

**6.** 398 F.Supp. 882 (N.D.Ill.1975), *aff'd,* 540 F.2d 1062 (7th Cir.1976).

**7.** *See also Barnes, supra,* 496 A.2d at 1044 n. 9 ("it is difficult to imagine that many persons confronted by a police officer would feel free to ignore questions and walk away, without being told of the right to do so").

*ernut, supra,* the Supreme Court held that the police had not seized a defendant who had begun to run when he saw their vehicle, although the officers accelerated to catch up with him and drove alongside him for a period of time until he dropped some contraband. The Court acknowledged that "the very presence of a police car driving parallel to a running pedestrian could be somewhat intimidating," 108 S.Ct. at 1980, but held that this kind of police presence "would not have communicated to a reasonable person an attempt to capture or otherwise intrude upon [his] freedom of movement," and did not constitute a seizure. *Id.*[8] In *Barnes, supra,* this court ruled that no seizure had occurred where a police officer approached the defendant outside a store, asked him to remove his hands from his pockets, and inquired why he was there and whether he had an arrest record. The court held that this constituted a consensual encounter "absent intimidating circumstances beyond the natural sense of obligation almost anyone would feel when a police officer begins asking questions." 496 A.2d at 1044. In *United States v. Burrell,* 286 A.2d 845, 846–47 (D.C.1972), this court likewise discerned no seizure when a police officer placed his hand on Burrell's elbow and said: "Hold it, sir, could I speak to you a second?" Moreover,

> the cases indicate that the officer may question [a moving pedestrian] without bringing about a seizure not only when the interrogation is carried on without interrupting the movement, but also when the officer overtakes the pedestrian and asks him to halt or summons him to where the officer is located.

LaFave, *supra,* at 409–10 and authorities cited at n. 232 and n. 233.

The kinds of circumstances which might indicate that there has been a seizure will vary widely, depending on the facts of the particular case. In *Mendenhall,* Justice Stewart suggested that a seizure might be found, even where the person did not attempt to leave, upon a showing of

> the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.[9]

446 U.S. at 554, 100 S.Ct. at 1877 (plurality opinion). *Accord, Barnes, supra,* 496 A.2d at 1043. In *Chesternut,* the Court reasoned that no seizure had occurred because, among other things,

> [t]he record does not reflect that the police activated a siren or flashers; or that they commanded respondent to halt, or displayed any weapons; or that they operated the car in an aggressive manner to block respondent's course or otherwise control the direction of speed of his movement.

108 S.Ct. at 1980. Obviously, these examples are illustrative rather than exhaustive, but they reflect a firm disposition on the part of the Court to require more than the reluctance to defy the police which almost any citizen would feel when approached by an officer in order to establish a seizure within the meaning of the Fourth Amendment.

**B.** *The law applied*

■ Applying these principles to the instant case, we must uphold the trial judge's ruling that no Fourth Amendment seizure occurred. Lawrence encountered Officer Ward on a public walkway in mid-afternoon. Ward was walking, not running, down the walkway, when he saw Lawrence disengage himself from the group upon the arrival of a vice operations police cruiser. The officer stopped in front of Lawrence, who was walking towards him with his fist clenched. Lawrence could have walked around Officer Ward on the approximately three-foot wide sidewalk, but chose not to do so. It was at this point that Ward identified himself as a police officer and

---

**8.** *Cf. In re D.J.,* 532 A.2d 138 (D.C.1987), a pre–*Chesternut* decision, in which similar activity by the police was conceded by the prosecution and held by this court to constitute a seizure.

**9.** The plurality opinion by Justice Stewart has become the law. *See Chesternut, supra,* 108 S.Ct. at 1979.

asked, in what Judge Moore found to be a calm, conversational tone of voice, what Lawrence had in his clenched hand.

In light of this record, we find no "intimidating circumstances" in this encounter. Officer Ward did not draw his gun. He ultimately testified that he did not order Lawrence to halt. Although Lawrence maintained that Officer Ward directed him to come over, Judge Moore explicitly credited Officer Ward's version of the events, and thus implicitly rejected those portions of Lawrence's testimony which contradicted the officer's account.[10] In any event, Lawrence did not claim to have been coerced into doing anything, and the judge found that a reasonable person would have felt free to leave.

The case is not without its problems. From a common sense perspective, Officer Ward's initial testimony that he "stopped" Lawrence certainly suggests a restriction on appellant's freedom to go about his business. The officer's lack of consistency as to whether Lawrence could have walked around him is troubling. The government's basic theory, borne out by Lawrence's ultimate conviction by the jury, that he knew that there was heroin in his hand, is hard to reconcile with the notion that Lawrence stopped and opened his hand of his own free will, thus voluntarily giving the police evidence with which to prosecute him.[11] We have stated that courts should be "earthy" in assessing street encounters between citizens and police officers, *Cooper v. United States*, 368 A.2d 554, 557 (D.C.1977), and the notion that Lawrence

accommodated the officer out of a public-spirited desire to cooperate may not be altogether compatible with hardnosed realism.

In light of the gloss placed by the Supreme Court on the concept of a reasonable person's feeling free to leave, however, the foregoing observations cannot affect the result.[12] The trial court's findings are simply inconsistent with the existence of the kinds of inhibitions on Lawrence's liberty, beyond the intrinsic pressures generated by any encounter with the police in a high crime area, which the Supreme Court has required in order to find a seizure on facts like these. Accordingly, the judgment of conviction is hereby

*Affirmed.*[13]

NEWMAN, Associate Judge, dissenting:

Because I cannot accept the majority's view that calling to a man, "Hey, big boy, come here," before confronting him in a three-foot wide alley and demanding to know what he has in his hand, is an effort "to seek cooperation," I dissent.

The police may lawfully approach persons on the street and ask for their cooperation in answering a few questions, even without reasonable suspicion; however, persons so encountered must remain free to ignore the questions and continue on their way. *Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 1323, 75 L.Ed.2d 229 (1983). If they are not free to continue on their way, because police have restrained them by means of physical force or a show

---

10. For the same reason, we cannot accept Lawrence's argument that a reasonable man would have felt coerced because Officer Ward and his partner had another suspect up against the fence immediately before the encounter. Judge Moore, while not directly addressing the point, made no finding that such an incident had occurred. He unambiguously found that no intimidating atmosphere was created.

11. We note, on the other hand, that Lawrence denied any knowledge of the heroin, and claimed to have opened his hand because he had nothing to hide.

12. Even though one would ordinarily presume that most individuals would not voluntarily act

in such a manner as to virtually seal their own doom, *Mendenhall*

> reject[ed] the argument that the only inference to be drawn from the fact that the respondent acted in a manner so contrary to her self-interest is that she was compelled to answer the agents' questions.

446 U.S. at 555, 100 S.Ct. at 1878 (Stewart, J., plurality opinion).

13. The government's argument, both in the trial court and in this court, touched in a general way on the proposition that Lawrence consented to the seizure and recovery of the drugs. In light of our disposition of the case and the lack of development of this distinct though related issue, we need not and do not reach it.

of authority, then a seizure within the meaning of the Fourth Amendment has taken place and the police must show the presence of an articulable reasonable suspicion or probable cause to support the restraint. *United States v. Mendenhall*, 446 U.S. 544, 552, 554, 100 S.Ct. 1870, 1876, 1877, 64 L.Ed.2d 497 (1980); *Terry, supra* 392 U.S. at 19–20, 88 S.Ct. at 1878–79; *Brown v. United States*, 542 A.2d 1231, 1235 (D.C.1988). Since the trial judge properly rejected the government's argument that the police had an articulable reasonable suspicion or probable cause for stopping Mr. Lawrence, the only issue before us is whether the police officer who approached Lawrence put on a show of authority that justified Lawrence in believing that he was not free to leave. For reasons I will discuss below, I believe that a reasonable person would have been justified in holding that belief.

As Justice Stewart has said, a show of authority may include "the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Mendenhall, supra* 446 U.S. at 554, 100 S.Ct. at 1876. However, when applying the *Mendenhall* test to determine whether such a show of authority has been made, courts must bear in mind that:

> [t]he test is necessarily imprecise, because it is designed to assess the coercive effect of police conduct, taken as a whole, rather than to focus on particular

details of that conduct in isolation. Moreover, what constitutes a restraint on liberty prompting a person to conclude that he is not free to 'leave' will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs.

*Michigan v. Chesternut*, 486 U.S. 567, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988).

Taken as a whole, the circumstances in this case belie the majority's characterization of the encounter between Lawrence and the police as non-coercive. The record shows that Officer Ward first encountered Lawrence as Lawrence was making his way toward the officer along a three-foot wide alley running between two buildings and bordered by fences.[1] Officer Ward, who is described in the record as a large, well-built man, thus stood between Lawrence and the end of this narrow alley. As Lawrence was moving through the alley, he observed Officer Ward and another officer "shaking down" a man against the fence bordering the alley. Lawrence testified that as he approached the officers, Officer Ward "hollered, 'Hey, big boy, come here.'" Officer Ward testified that he identified himself as a police officer, and that Lawrence "stopped right in front of me because he couldn't go around because of other people." Lawrence testified that after stopping in front of the officer, the officer said "Open your hand." Officer Ward testified that he used a conversational tone. Lawrence complied.

---

1. Although Officer Ward tried mightily to define the area in which the encounter took place as a "sidewalk," his own description of the area on cross-examination belies his attempt:

> MR. VARMER: Well, that's another thing. Where you marked sidewalk [on the diagram], isn't that really the alley?
> OFFICER WARD: No, sir. The sidewalk—it's projects on each side with a sidewalk going right between them.
> MR. VARMER: Well, a sidewalk usually goes along the street. Every street I've ever seen, including Alabama Avenue, the sidewalk runs along with the street, not at a ninety-degree angle of the street.
> OFFICER WARD: Yes, sir, but you've got a sidewalk that goes right between the buildings. It's a path—it's a passageway.
> THE COURT: It's a passageway that is paved; is that right?
> OFFICER WARD: Yes, sir.

> THE COURT: And you refer to it as a sidewalk.
> OFFICER WARD: Yes, sir.
> THE COURT: And it goes from Alabama over to the alley.
> OFFICER WARD: Yes, sir.
> MR. VARMER: Well, it's a narrow sidewalk, right, with a fence on each side?
> OFFICER WARD: Yes, sir.
> MR. VARMER: OK. Well, then, we agree....

Lawrence also described the area as an alley:

> MR. VARMER: Did a police car arrive or did you learn that a police car had arrived?
> MR. LAWRENCE: Yes, sir, a police car did arrive as I was walking through the alley.
> \* \* \* \* \* \*
> THE COURT: Now, when you are saying 'alley' you are referring to what the officers (sic) call a walkway?
> MR. LAWRENCE: Yes, sir, walking toward that.

This encounter in a narrow alley has all the earmarks of a show of authority. First, Officer Ward identified himself as a police officer both by his actions in "shaking down" the man against the fence and by his words of identification. Second, Officer Ward lacked an articulable reasonable suspicion for stopping Lawrence. Third, Officer Ward summoned Lawrence to him, rather than approaching Lawrence with a question, using words and a tone indicating that he was ordering Lawrence to stop. Fourth, Officer Ward physically blocked Lawrence's egress from the alley. Fifth, Officer Ward spoke to Lawrence in such a way as to convey the impression to a reasonable person that he was ordering Appellant to reveal what was in his hand.[2]

Contrast this with the situation in *Mendenhall,* in which officers approached the subject in the public concourse of a major airport, instead of summoning the subject to them, and requested, but did not demand, to see her identification. Moreover, although the majority is satisfied that the physical element of this seizure, the blocking of Lawrence's egress, did not occur, that finding is based on a selective reading of the record. Officer Ward stated several times that the width of the alley was three feet. In his initial description of the encounter, he stated that Lawrence was unable to go around him because of the presence of other people. It was only in response to subsequent questions by the court that the officer asserted that Lawrence could have walked around:

> THE COURT: Did he—if he had kept walking, I take it, he would either have to walk around you or he'd walk into you, is that right?
>
> OFFICER WARD: Well, the sidewalks are, you know, about that big, three-foot sidewalk. He could have walked around.

Questioned further on this point by defense counsel, Officer Ward added: "[H]e had enough room to walk around me instead of squeezing by."

Although the laws of physics permit two bodies to pass without touching in a three-foot wide alley, when one of them is a policeman and he is saying to the other, "Hey, big boy, come here," the law of search and seizure, as interpreted by *Mendenhall,* requires something more than mere possibility. The majority is correct in pointing out that all police-initiated encounters with citizens are accompanied by some degree of anxiety on the citizens' part, as well as what Professor LaFave called "moral and instinctive pressures to cooperate."[3] And it is true that the "freedom to walk away" must be understood in the context of real-life police-citizen encounters. However, it is undeniable that in this case Lawrence was required to exercise his freedom to walk away in a three-foot wide alley with a large, well-built policeman between him and the alley's end, a policeman in the process of "shaking down" another man, who shouted or said to Lawrence, "Hey, big boy, come here." Because I find that the circumstances of the encounter were such that a reasonable person would not feel himself free to leave, I would reverse.

---

**2.** Testimony on this point was somewhat inconsistent as to the words used. Lawrence first testified that Officer Ward said "What's that you got in your hand;" Later, he said the officer's words were: "Open your hand."

